All right, Mr. Tenney, you up first. Thank you, Your Honor. May it please the Court, Daniel Tenney for the United States. The District Court properly rejected the theory, the standing theory on which plaintiffs sought a preliminary injunction, which was the listener standing theory, holding that it was foreclosed by the Missouri decision. As to the other theory, in addition to being waived expressly, that theory is also foreclosed by the Missouri decision. What the Supreme Court said in Missouri, particularly about redressability, was that as to COVID-19 the government's interactions with social media companies had slowed to a trickle before the complaint was filed, and that enjoining the government, therefore, would be unlikely to affect future content moderation decisions by the social media platforms. Plaintiffs really don't even attempt to address that inadequacy in the record, the Missouri record, which is the same as this record, except for three new declarations that don't address that issue at all. The three new declarations talk about reasons that they think that their evidence of past content moderation is stronger than the evidence of past moderation of the plaintiffs in the Missouri case. We have some issues with some of the conclusions that they draw about that, but you don't even have to get that far because the fundamental point is they have no answer on redressability. If the government, as to COVID-19, was not engaging in the level of communications that the Supreme Court held would be likely to influence the social media platform's conduct, there's no injury to be redressed. As the Supreme Court pointed out, the platforms are not defendants here, and enjoining the government wouldn't do anything to redress any injury of these plaintiffs. When they try to explore this in their brief, they talk about two things. They talk about the fact that the platforms have done something in the past that they think was attributable to the government, the effects of which are still ongoing. The Supreme Court addressed exactly that in its opinion and said even if there was a policy, it may be true that there is some policy that the platform adapted in the past that was tainted by the government's conduct, but even so, they wouldn't have forward-looking injury and therefore no redressability because without continuing pressure from the government, of which there was not evidence, that wouldn't suffice to show redressability. The second thing they try to argue is that now the government is trying to do something. They point to activities by the FBI and CISA, but those aren't the entities that they say harmed them in the past because all their past harms are about COVID-19, and that's not what the FBI and CISA are accused of doing. There, they run into yet another problem from the Missouri decision, which was that the Supreme Court said, we can't treat the defendants as a monolith. We have to go claim by claim, plaintiff by plaintiff, defendant by defendant. Plaintiff by plaintiff, what is your argument on their standing? Well, I mean, there are three plaintiffs. One of them was just a listener standing theory, and so I can talk about that if you want. The district court rejected that. The district court threw that out, but what about the other two that the district court thinks had standing? Well, I mean, that was Robert F. Kennedy and Children's Health Defense, and both of them, the claim was, in terms of past harm, that there was moderation of their content related to COVID-19 by the White House, the CDC, and the Surgeon General's office. That was the claim, and that's the same as what the Missouri plaintiff said in the Supreme Court. And they lost in Missouri. And they lost in Missouri, and so then you would have to say, okay, what's different about these plaintiffs from the Missouri plaintiffs? And what they say is different is their evidence that the past content moderation was actually caused by the government is stronger for these plaintiffs than it was for the Missouri plaintiffs. Do you agree with them? It may be stronger. I'm not sure if it's strong enough, but in any case, what the Supreme Court said, there was a plaintiff in Missouri that the Supreme Court said, all right, well, maybe she's eked out a showing of traceability. This was Plaintiff Hines in Missouri, but even so, there's no standing because she can't show redressability. Okay, so are you agreeing that they lack standing, or are you saying they do? I'm saying they lack standing. Okay, because you don't seem to be saying that. Can you please explain why they lack standing? They lack standing because there's no redressability, for the same reasons that the Missouri plaintiffs didn't have redressability in the Missouri case. And they haven't addressed that hole in their standing theory at all. So there's just no standing here, and that could really just be the end of the case. That's why I'm asking about it. Yeah, no, and if this court just holds that that theory is foreclosed by Missouri, as it pretty clearly is, that would be the end of this. I mean, at least at the end of the preliminary injunction, and we would hope the district court would take the guidance and grant a motion to dismiss, and this case would come to a close. I'm happy to take questions about standing. I actually think it's a relatively straightforward issue, given what the Supreme Court has said. I'll say something about the merits in case the court reaches it, although, again, as I say, I don't think they need to. Well, just elaborate, if you will, on where you are. The plaintiffs say there is something different, and you have to read the briefing close, and then when counsel gets up, they'll sort of address that, but we've got these affidavits here and so forth, and so what's your appreciation of what plaintiffs argue is qualitatively different to result in a different outcome than before? I know your baseline is no different, but at least address the ways presented. Okay. I mean, I think the things that they say are different. They say that the evidence that these plaintiffs were specifically targeted by the government in the past, in 2021, is stronger than it was for the Missouri plaintiffs. That's the first thing they say, and the second thing they say is that there is, you know, one of them was deplatformed, and that deplatform is still going today. I think those are the two main arguments that they have in those affidavits that you reference, and I mean, we have some quibbles with that. I don't want to accede to all of it, but if we spot them all of that, if we just sort of give them that, then all they're saying is back in 2021, the government took actions that harmed them, but the Supreme Court made clear over and over again in the Missouri decision that that's not good enough because you have to show that you have an entitlement to forward-looking relief, and in order to do that, you have to show that an injunction against the government now would redress an injury, and so then you have to show that some government conduct is affecting the platform's content moderation now, and those declarations that you referenced don't say one word about that, nothing. They talk about what happened in 2021. They talk about what's happening, what the platforms are doing to them now, but they say nothing about what the government is allegedly doing now, and that's because the Supreme Court already addressed that on a robust factual record and said the COVID-19 communications had slowed to a trickle, that enjoining the government would not be likely to affect the platform's content moderation, that even if the platforms had made decisions based on interactions with the government in the past, the ongoing effects of those decisions aren't traceable to the government because the platforms are exercising their independent judgment now. The Supreme Court said all of those things based on the same record except for these three declarations, none of which addresses those issues at all, and that should really just be the end of the case, at least of this appeal, and we hope of the case, we hope this court can give guidance. I mean, you know, they would have to surpass waiver also if they were going to get the preliminary injunction reversed, but we hope that this court can give guidance because the district court seems to be misunderstanding the import of the Missouri decision for this case. And . . . Well, obviously, if we found no standing, that's the end because that's jurisdictional. I know you said you wanted to address the merits, so let's assume, arguendo, we find standing. Then what? Well, so, I mean, the plaintiffs basically say that you should just accept the rest of the prior Missouri decision, and there's basically three reasons that that's not correct. The first and simplest is that the Supreme Court held that this court didn't have jurisdiction to issue that decision, so treating it as binding precedent doesn't make sense for that reason. The second is that the standing issue and the merits issues are not sort of hermetically sealed. The Supreme Court said a lot of things in the Missouri . . . in the Supreme Court's Missouri decision that cast a lot of doubt on elements of this court's decision. It talked about how some of the factual findings appeared to be clearly erroneous on which the decision was based. It talked about the need for a granular approach where you would really break it down and not have these sort of sweeping generalizations. That's relevant to traceability and redressability, but it's also relevant to, you know, whether the government is being coercive in a particular instance. So there are a lot of things that the Supreme Court said in the Missouri decision that you can't just sort of say, oh, well, ignore all of that and just go back to the decision that the Supreme Court was reviewing on exactly the same record. And finally, there's the Volo decision from the Supreme Court, which talks about the legal standard and makes a few things clear, including that the government is permitted to try to engage in even forceful persuasion, that it said explicitly that you can't treat as dispositive the authority that a governmental actor has. That's something that the . . . that this court essentially did for the FBI and to some extent, the White House in the last appeal. So I mean, for all of those reasons, you would take a fresh look at the merits if you were to reach the merits, which again, we don't think are properly before you because of the jurisdictional issue. And if you did, what you would see is, and again, the Supreme Court pointed out the platforms were exercising independent judgment. There were, you know, there were back and forth with the government, but it wasn't just that they were doing what the government said. And that defeats the plaintiff's claims on the merits too. I'm happy to talk about the specifics of any of that. I'm not, I'm not sure if there's anything the court's concerned about. What if any import is there to Robert Kennedy's change of status? I mean, I think you'd have to get a decent ways down in order for it to matter. I mean, the district court seemed to think it was important that he was a candidate for election. You know, that was wrong at the time for a number of reasons. There was no evidence that he had been or will be in the future subject to governmental action on the ground that he's a candidate for election. That was speculation as bad or worse than the speculation that the Supreme Court deemed inadequate for Hoft. But the district court seemed to think it was important that it was a candidate. So if he's no longer a candidate, then that argument, whatever force it had, which we thought would be quite limited, you know, should disappear. But I don't, I mean, again, that's, that's pretty far down the chain. You know, Does it matter that President Biden is no longer a candidate? I don't think so, Your Honor, and President, at least at the time of the district court's most recent standing decision, that was already true. So I don't know that that's a change in circumstances since the district court ruled on standing. So I'm not sure that that would matter. Okay. Unless there are further questions, I'll just mention that our stay motion, I think, is still before this panel. We obviously renew our request that a stay remain in effect until this court decides and for at least 10 days thereafter, if any portion of this court's ruling is adverse to the government. And with that, I'll save the rest of my time for rebuttal. Thank you, Your Honors. Thank you. Your rebuttal time is intact. All right. Mr. Rubenfield. Good afternoon, Your Honors. Good afternoon. Please, the court. Jed Rubenfeld for the Kennedy plaintiffs. You know, the one thing I want to emphasize at the outset before answering any questions you may have, which I'm eager to do and saying some things you heard just now are not correct. One thing I'd like to emphasize at the outset is that plaintiffs, in this case, are not asking this court to break a single inch of new legal ground. We are only asking the court to apply established law, including Murthy, to uphold a very narrow standing holding. Let me explain exactly why the district court's standing holding is so narrow, because you might not see it at first, but it is because it rests on five facts, five facts that distinguish the Kennedy plaintiffs from the Murthy plaintiffs, and for that matter, from just about anybody else in the country. So there's no floodgates problem here. Fact one, the Kennedy plaintiffs were specifically targeted for censorship by the government defendants. And by specifically targeted, I mean singled out by name. That wasn't true in Murthy. Fact two, as a result of this targeting, they were not only censored, but in CHD's case, that's Children's Health Defense, one of the two plaintiffs, one of the three plaintiffs that we're talking about here, actually de-platformed, kicked off of Facebook, Instagram, Google. Now that fact of de-platforming is very significant, as I'll explain in just a moment. Now this, fact three, this censorship and de-platforming were specifically caused by coercive threats communicated by the government to the platforms. We have a specific causation finding from the district court. Government defendants said, de-platform these plaintiffs or potentially suffer devastating economic consequences. That's a specific causation finding, didn't have that in Murthy. Fact four, this is not a past injury. In CHD's case, this is why de-platforming is so important. It's a present existing injury. In Murthy, the court emphasized over and over, plaintiffs were only asserting past injuries. This is a present ongoing injury. CHD's de-platforming, which happened a couple years ago, is exactly the same right now, unchanged in status as it was then. In other words, government defendants are directly responsible for the injury that CHD is currently suffering. Nothing like that in Murthy. Now, fact five, we have evidence, and the Murthy plaintiffs didn't, that the challenged conduct, the governmental conduct that's challenged and that was found unconstitutional by this court in Missouri is still ongoing. They didn't have that in Murthy, we do. The FBI's, CISA or CISA, have admitted that they have resumed exactly the same operations as they were conducting before. They put it on pause during the Supreme Court's consideration of Murthy and then they restarted it again. Government didn't tell the Supreme Court about that, but we have the evidence and the District Court found that, in its opinion, completely different from Murthy. CDC as well, we have evidence CDC is still engaged in the very same conduct today that this court, in the Missouri case, found unconstitutional. Why is this, why does this distinguish these plaintiffs from the Murthy plaintiffs? It's very simple, Your Honors. Number one, the Murthy court said the primary weakness in the Murthy plaintiffs' standing arguments, the primary weakness was the lack of a specific causation finding. That was a primary weakness, we have that. We now have a specific causation finding, government defendants through threats caused the deplatforming and censorship that they suffered. Number two, primary weakness number two was, said the Murthy court, that there was no . . . not only was there no showing of specific causation, that all they had was past injury. The court said that over and over. That's not true in our case. Number three, we have specific evidence of, in the event of a favorable ruling from this court, of a significant increase in the likelihood of our plaintiffs receiving relief. That's the test, that's the established test for addressability. That's the test this court used in the Gutierrez case. Judge Haynes was a member of that panel. Significant increase in the probability of receiving relief. That's the established test for standing. It's also established that what you do when you've got third parties, you look at the predictable effects of this court's ruling on third parties. Let me tell you what the predictable effect of this court issuing a favorable ruling in our case is. It's very simple, Your Honor, there's no puzzle or mystery about it. This court issues a preliminary injunction based specifically on a finding that a platform's breaking out, children's health defense, for example, was likely unconstitutional or just was unconstitutional. If this court issues that ruling, that exposes Facebook and other platforms and the individuals who are at those platforms to damages suits if they continue that deplatforming going forward. That changes their incentives because now they're on notice that it's potentially unconstitutional. Now you are, when you take into account the predictable effects of a ruling on third parties, you're permitted to look at changes in incentives. That's what this court does, that's what the Supreme Court does. That change in incentive makes it more likely that they will reinstate CHD. The test is a significant increase in the likelihood of receiving relief. That's the test. What's the likelihood right now of receiving relief? Zero percent. CHD has been litigating against Facebook for years. They have not reinstated them. Right now, zero percent chance of getting that relief from Facebook. If this court issues a ruling saying that was likely unconstitutional, what you did, and it'll be likely unconstitutional if you keep doing it, that changes their incentive and that increases the likelihood that we will be reinstated. Simple incentives. In addition to that, I want to emphasize again, we, unlike the Murthy plaintiffs, have evidence that the challenge conduct is ongoing. Very important to the Supreme Court's redressability holding in Murthy, and it's just different now because we have evidence that that challenge conduct is ongoing. Now I'd love to answer any questions you might have about standing. I would switch now to the merits if you would like me to. What we have argued in our brief, I believe this is correct, is that this panel is bound by the Fifth Circuit's previous . . . How can we be bound by something we had no jurisdiction over doing? I beg your pardon, Your Honor? How can we be bound now by something we did that we lacked jurisdiction to do? Got you. Okay. Yes, that's the government's argument, very important question. I would say this, Your Honor, in previous cases, the Fifth Circuit has ruled explicitly that if the Supreme Court does not vacate an opinion of this court, if it just reverses, this court remains bound. Well, but that could be on merits. I mean, I understand that concept, but if I ruled on a car accident in Louisiana that was under $75,000 between two Louisiana people, how is that relevant at all? I don't have jurisdiction over that. There's no diversity, and it's not federal. So you might find it interesting what I ruled, but I lacked jurisdiction. So it's irrelevant. So then the way I ruled on that and I write out about how cars should be, while that might be interesting, might be helpful, it is not binding. Well, it's interesting, Your Honor. There's logic to that, and that is the rule in collateral estoppel law. If a court didn't have jurisdiction, its findings are not binding in collateral estoppel. But that's not the rule when it comes to the bindingness and presidential quality of circuit court opinions. There are thousands of circuit court opinions out there that refer to and treat as binding previous circuit court opinions, including here in this circuit, that were reversed on jurisdictional grounds. Reversed on jurisdictional grounds, I cited one from the Fifth Circuit in my brief. Fifth Circuit has previously treated as binding precedent a past decision by a past jurisdictional grounds. Second Circuit did it just a few years ago, a case called Obama v. Hudgens, also cited in my brief. The government fails to cite a single case supporting the . . . I get the logic of what you're saying, Judge Haynes. There could be such a rule, but plans don't cite a single case to hold it. Show me the case that says where the case has been reversed on jurisdictional grounds is not binding anymore. This very court, the Fifth Circuit, has treated past cases as precedent, even when reversed on jurisdictional grounds, and where's that case? Why, all those cases that relied on past cases reversed on other grounds, they might all be wrong. We decided we'd have to go back and look at those cases to see if the reversal was on jurisdictional grounds. They don't add, and by the way, it was not reversed on jurisdictional grounds. Where's the court that has said, we're treating as precedent this case that was reversed on other grounds, but notice that it wasn't reversed on jurisdictional grounds. Where's that case? This court's just upheld the Texas v. Biden as binding precedent in several cases, reversed on other grounds by the Supreme Court. There's no footnote that says, and by the way, the reversal was not on jurisdictional grounds. So I understand the logic. It certainly makes sense. You could have such a rule. We have it in collateral estoppel law. We do not have it in the treatment of . . . and part of the reason is, Your Honor, that if you went ahead in that diversity case and you reached some legal issues, you reached the legal issues. Maybe you were wrong about the jurisdiction, but you reached the legal issues. You made your decision as a panel, and according to the past decisions of the Fifth Circuit itself, your decision would have precedential value with respect to the non-reversed issues. Now, I'm happy to argue, in case Your Honor finds that you're not bound, I'm happy to argue that everything the court, the Fifth Circuit, said in the Missouri case was absolutely correct. Well, I have no doubt we can review it and at a minimum treat it like an unpublished opinion. I get that. But I guess I'm wondering, let's assume arguendo we don't think we have to follow it. What then is your basis for the merits? What . . . Yes. I'm going to answer your question. I promise you. I'm going to say just one more thing about the previous point, and then I promise you I will answer your question. The Supreme Court knows that when it vacates, it deprives the previous opinion of all precedential value. The Supreme Court has said that for fifty years. The Supreme Court knows the difference. In the Voolo case, which it overruled recently, it vacated, deprived that whole opinion of precedential value. It did not vacate this court's opinion in Missouri. The Supreme Court understands very well what it's doing. But it did challenge us on a bunch of stuff. I mean . . . No, that's true. Even if we put aside the standing, your opponent noted that it wasn't like they said, oh, this was the most beautiful opinion we ever read, but sadly you lacked jurisdiction. We're just crying about that. No, that's not what they said. I noticed that too, Your Honor. Okay. So then even if we say we should follow it, we shouldn't follow it if the Supreme said, yuck, yuck, yuck. Right? Well, on the yuck, yuck factor, there is actually case law on that too from this circuit. This circuit says, as all the other circuits do too, that there must, almost all the other circuits, that there must be an unequivocal overruling. If you're going to argue that a Supreme Court case has undercut a previous panel's decision, you can't just say, oh, it might have undercut it. Yeah, but that's when we're talking about, oh, this opinion, how has that influenced this other one? But this is directly on the case. It's not something where they mention something that if you look at some other opinion, you might go, oh, my heck, this is this case. So that's a little different, right? Well, that is different. I mean, they did say they're not reaching the merits, but I take your point completely. It's certainly not reaching the merits. It's certainly very different from the other. I mean, let's take a hypo if they said, well, the Fifth Circuit lacked standing or lacked jurisdiction over this case because of standing. But man, pages 10 through 15 were the dumbest we've ever read. They're really bad. They're really stupid. Okay, let's say if they said that. Would we be bound by pages 10 through 15 anyway if we were dealing with something that didn't have a lack of standing? Well, you're asking me a tough question there. I've got to stick to my argument. Yes, I believe under this Circuit's precedence, you'd be bound. That would be dictum, certainly not unequivocal overruling. But here's what I want to do. I want to come back to your previous question. Okay. Let's assume for a moment that contrary to our arguments, this Court decided it was not bound by this Court's previous panel decision in Missouri, which I believe it is. But let's say you decide you're not. Then the question becomes, let's go to the merits. Let's talk about the merits of the case. We have a several-year campaign by the federal government to induce social media platforms to censor protected speech. Nobody disagrees about that. The only question on the merits is whether they cross the line, the line of unconstitutionality. Now, you can cross that line of unconstitutionality in a number of ways. You can do it, number one, which everybody agrees to, by coercion, by inducing a private party to suppress other people's speech through a coercive threat. We have specific findings of coercive threats. Now, in this case on the record before you, and, of course, the Missouri court, even some binding, they have a long, detailed discussion of all the evidence in the record showing coercive threats. The coercive threats took two kinds. Number one, threats of antitrust enforcement. And number two, threats of removing Section 230, immunity from liability. These are $100 billion threats made to social media platforms, plenty of evidence in the record. So there's plenty of evidence showing coercive threats induced social media companies to suppress speech. In addition to coercion, this court found in Missouri, on the basis of a different theory of state action, not coercion, significant encouragement. And I don't know how far we're going in getting rid of what the Missouri panel said, but significant encouragement is a different theory. It doesn't require coercion. It requires that the government get in there and entangle itself with a private party and exert some kind of meaningful control and influence over what they're doing, even short of coercion. The Missouri panel found and discussed at length, in detail, evidence from this record of such significant encouragement. We think it was absolutely correct, and we have not heard a word. I don't see a word from – I didn't hear a word from government counsel, and I don't see it in their brief, why any of that was mistaken. And we have suggested in our brief that there's yet a third theory, which this court could uphold the injunction on the basis of, that the Missouri panel didn't reach. And that's agreement. It's well-established law that if the government comes to an agreement with a private party to do something, then the private party doing it is state action. It doesn't have to be coercion. You could have a cop on the street. He's got the trunk of a car. He wants to look in the trunk, but he can't because of the Fourth Amendment. He can't go through the luggage. He's got no warrant, no probable cause. He says to a passerby, hey, I'll give you 50 bucks if you'll do it for me. That's not coercion. It's not even significant encouragement. If that passerby did it, of course that would be state action. Every court in the country would still find, because they reached an agreement. This is the Adichies case from the Supreme Court. If a government official and a private party reach an agreement, an understanding is what the Adichies court said, then what the private party does is state action, and it's unconstitutional, too, if it violates the Constitution. There is tremendous amount of evidence that the government officials reached an agreement and then engaged in concerted conduct. That's the test, agreement plus concerted conduct to suppress constitutionally protected speech. So you could affirm on that basis, too. And, by the way, we have evidence that the government's still in there trying to influence FBI, CISA, CDC, still today doing the very same thing, getting in there, trying to influence what social media platforms are doing with the purpose of trying to get them to suppress speech that they deem, they call misinformation. But we have seen over and over again that what they call misinformation often doesn't turn out to be misinformation. It turns out to be protected speech. We all want to protect the First Amendment. I'm sure government counsel does, too. District Court called this the most massive attack on free speech in this nation's history. And it would be shocking if no plaintiff in the country had standing to challenge it. On government counsel's arguments about standing, I don't know who would have standing. If the Kennedy plaintiffs deplatformed because of actual threats, don't have standing, I don't know who would. I certainly do not think that Murthy says that no party can have standing. I don't think it can be read that way. On redressability, Your Honors, the government's repeated focus on a sentence from the Murthy opinion, it's 144, Supreme Court, 1995, or the end of the opinion saying, well, you know, emphasizing that there's still a redressability problem. Read the paragraph. Don't rip that sentence out of context. The paragraph says, if there isn't evidence that the challenge conduct is still ongoing. But more than that, what the government's argument with respect to that sentence is, they're saying, pay no attention to the 90% of the opinion that came before. Pay no attention when we said that the primary weakness was no specific causation finding. Pay no attention when we said that the primary weakness was only past injury. You could throw out the whole opinion according to them and just look at that. That's not how we read law. That's not how I teach my students to read law or to read Supreme Court cases. You've got to look at that sentence, that paragraph, in relation to everything else they said, because that paragraph repeats it. It says the only injuries they're asserting here are past injuries. And the threat, their asserted threat, that they might be injured and suppressed in the future. That same paragraph that they're focusing on, where it says they still have a redressability problem, says those very same things. And we have those things. We have a specific causation finding, and we have present injury, not just past injury. All right. Thank you, counsel. You've got a red light. Thank you, sir. We appreciate your responses to questions and your argument briefing. All right. Rebuttal. Mr. Cheney. Thank you, Your Honor. I want to zero in on standing and redressability here. The first thing, this quote that he talked about primary weakness a couple of times, I just want to read the full sentence. It's in the part of the Supreme Court's discussion of past harms on page 1987 of the opinion. The primary weakness in the record of past restrictions is the lack of specific causation findings with respect to any discrete instance of content moderation. The Supreme Court did not say the primary weakness in the whole case was the past restrictions. It said within past restrictions, the primary weakness was the lack of any specific causation findings. Redressability was another ground. They didn't say that was any less primary. He talked about five facts at the beginning. Four of them had nothing to do with redressability. They all went to the past. The fifth was that the conduct was ongoing. And so I just want to focus on that. His evidence that the conduct is ongoing is that the FBI and CISA are still engaging. He says, and CISA. Really, he only has evidence of the FBI is still engaging in some conduct. His past harms, of course, have nothing to do with the FBI. They're all about COVID. And what the FBI is doing is when it has good evidence of foreign malign influence, it informs the platforms with the caveat that they can do whatever they want with the information. None of these plaintiffs claim that they're foreign malign actors or that the FBI would identify them as such. So that really has nothing to do with anything either. There was an accusation in the brief repeated from the podium that the government had misled the Supreme Court about what conduct was ongoing and wasn't ongoing. You know, that's a serious accusation, so I just want to address it here. We've addressed it on page 11 of our reply brief. What the Supreme Court said, and I'm quoting, was, CISA, meanwhile, stopped switchboarding in mid-2022, and the government has represented that it will not resume operations for the 2024 election. And then we quoted on the same page, 11 of our reply brief, where that came from. CISA did not engage in switchboarding for the 2022 election cycle and has no intention to engage in switchboarding for the next election. That is not a misrepresentation to the Supreme Court. That is accurate. What the Supreme Court took from it was not misunderstanding what we were saying, and so there is no evidence that the conduct related to COVID-19, which they claim to have been injured by in the past, is ongoing. The Supreme Court expressly addressed that issue. There's nothing in this record that changes any of that. The last thing that they said about redressability, I think this is a new theory from the podium, was that they could maybe get damages against Facebook if this court rules in their favor. I mean, that's not... They need to show, as the Supreme Court expressed in Missouri, and this is not a new thing, they need to show that the remedy against the defendants before the court, not some influence that this court's opinion might have, will affect them. They say we didn't address a bunch of their merits arguments. We actually addressed them extensively in the reply brief. I'm happy to rest on those arguments unless anybody has any questions. I think this should just be resolved on standing. So unless there are further questions, I'm happy to rest on my briefs for the rest. All right. Thank you, counsel. Thank you, Your Honor. Both sides for robust briefing in the oral argument that you presented and throughout the case to that effect. So that concludes the oral arguments in the cases we had docketed.